# UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
### ROCK HILL DIVISION

|  |  |
|---|---|
| South Carolina Department of Health and Environmental Control, <br><br> Plaintiff, <br><br> -vs- <br><br> The United States of America, AbbVie Ltd, Air Products and Chemicals, Inc., Akzo Nobel Coatings Inc., Alpha Assembly Solutions, Inc. (f.k.a. Alpha Metals, Inc.), American Woodmark Corporation, Arkema Inc, Ashland Inc. (f.k.a. Ashland LLC prior to 8-1-2022), Avon Products, Inc., BASF Corporation on its own behalf, and on behalf of the former Ciba Corp. and former Cognis Corp., Lanxess Corporation, Bayer CropScience Inc., Goodrich Corporation, INEOS US Chemicals Company (f.k.a. BP Amoco Chemical Company) and Atlantic Richfield Company, Carolina Solvents, Inc., ViacomCBS Inc., Chemical Waste Management, Inc., Chevron Environmental Management Co. for itself and as Attorney-In-Fact for Texaco, Inc. and its affiliates, Ciba-Geigy Corporation, by Ciba Specialty Chemicals Corporation, Clariant Corp., Clean Earth of North Jersey, Inc., Clean Harbors Environmental Services, Inc., CNA Holdings LLC, Cognis Corporation, Colgate-Palmolive Co., United Airlines, Inc., Cosan Chemical Corporation, Dow Silicones Corp. (f.k.a. Dow Corning Corp.), Eastman Chemical Company, ECOFLO, Inc., General Dynamics Corp., General Electric Company, Giant Cement Holdings, Inc., GlaxoSmithKline LLC, Honeywell International, Inc., ICI Americas Inc., Gabriel Phenoxies, Inc. fka InChem Corp | Case No.: _____ <br><br> 0:22-cv-03445-SAL <br><br><br><br><br><br><br><br> **COMPLAINT** |

| | |
|---|---|
| a North Carolina Corp., Ingersoll Rand, Inc., International Paper Company, Johnson & Johnson, KEMET Electronics Corporation, Mallinckrodt LLC, Merck Sharp & Dohme Corp., Nation Ford Chemical Company, Norlite Corporation, Perma-Fix Environmental Services, Inc., Pfizer Inc., on behalf of itself and its subsidiaries, Pharmacia LLC, Raytheon Technologies Corp (f.k.a. Uited Technologies Corp), Rohm and Haas Company, Schlumberger LTD, SET Environmental, Inc., The Sherwin-Williams Company, Shurtape Technologies, LLC, Sonoco Products Co., Stauffer Management Company LLC, Sun Chemical Corporation, The Chemours Co. FC, LLC, Unilever United States, Inc., Union Carbide Corporation, Univar Solutions USA Inc. , The Valspar Corporation, Pfizer Inc., on behal of Wyeth LLC and Wyeth Holdings Corporation | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

The Plaintiff, South Carolina Department of Health and Environmental Control ("the Department" or "Plaintiff"), complains of the Defendants as follows:

## NATURE OF THE ACTION

1)    This is a civil action brought pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. §§ 9601, *et seq.*, as amended, the South Carolina Hazardous Waste Management Act ("SCHWMA"), S.C. Code Ann. §§ 44-56-10 to 840; the South Carolina Pollution Control Act ("PCA"), S.C. Code Ann. §§ 48-1-10 to -350; and the

**COMPLAINT**
*SC DHEC v. United States of America et al.*

Federal Declaratory Judgment Act, 28 U.S.C. § 2201, as amended. This action is brought for the following purposes:

a)     the reimbursement of the Department's past and future response costs incurred by the Department to respond to a release or threatened release of CERCLA hazardous substances, pollutants, or contaminants at a waste storage, treatment, disposal, and incineration facility (the "Facility") at 2324 Vernsdale Road, Rock Hill, South Carolina (the "Facility Property"), and surrounding areas, if any, impacted by the migration of hazardous substances, pollutants, or contaminants (together with the Facility and Facility Property, the "Site");

b)     the funding and performance of response actions by the Defendants; and

c)     Court approval of the proposed Consent Decree (Exhibit 1) agreed to by the Plaintiff and the Defendants.

2)     CERCLA was enacted by the United States Congress in 1980 to create a comprehensive approach to identify and remedy facilities contaminated by hazardous substances and other pollutants and contaminants. The Site and surrounding contaminated areas constitute such a facility within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9). Congress determined that strict, joint, several, and retroactive liability for the costs of remedying such facilities should be imposed upon the following categories of responsible parties: 1) the current owner or operator of a facility; 2) those who owned or operated a facility at the time of disposal of any hazardous substance; 3) those who arranged for disposal or treatment, or arranged for the transportation for disposal or treatment, of hazardous substances at a facility; and 4) those who accepted hazardous substances for transport to treatment or disposal facilities selected by such person. *See* Section 107(a) of CERCLA, 42 U.S.C. § 9607(a).

3)      Under CERCLA, these persons are strictly, jointly, and severally liable for all costs of responding to hazardous substance contamination at facilities containing hazardous substances even if at the time of the disposal these persons may have been complying with existing laws. The strict liability of CERCLA imposes liability, without the need to prove causation, upon all persons who fall within CERCLA's definition of responsible parties. *See* 42 U.S.C. § 9607(a). CERCLA's joint and several liability scheme imposes liability for all response costs upon each responsible party, unless that responsible party can demonstrate one of the affirmative defenses set forth in Section 107, 42 U.S.C. § 9607, or that the responsible parties acted independently to cause separate harms and there is a reasonable basis of apportionment.

## JURISDICTION AND VENUE

4)      This Court has jurisdiction over the subject matter of this case pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. § 2201 (declaratory judgment), Sections 113(b) and 113(g)(2) of CERCLA, 42 U.S.C. §§ 9613(b) and 9613(g)(2) (grant under CERCLA of exclusive jurisdiction), and 28 U.S.C. § 1367 (supplemental jurisdiction).

5)      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and Section 113(b) of CERCLA, 42 U.S.C. § 9613(b), because the Site that is the subject of this action is located in this district; and the release or threatened release of hazardous substances and the response to those releases, as alleged herein, occurred and continues to occur within this district.

6)      Plaintiff has provided copies of this Complaint to the Attorney General of the United States and to the Administrator of the United States Environmental Protection Agency, in accordance with CERCLA Section 113(l), 42 U.S.C. § 9613(l).

**COMPLAINT**
*SC DHEC v. United States of America et al.*

7)    This Court has personal jurisdiction over the Defendants in this action pursuant to S.C. Code Ann. §§ 36-2-802 and 803 because this action arises from (1) the arrangement for the disposal of hazardous substances by Defendants who knew or should have known that such hazardous substances would be disposed of within the State of South Carolina or (2) the acceptance of hazardous substances for transport by Defendants who knew or should have known that such hazardous substances would be disposed of within the State of South Carolina.  In addition, each Defendant meets one or more of the following criteria:

a)    Defendant is domiciled in, organized under the laws of, doing business, or maintaining its principal place of business in, this State;

b)    Defendant transacts or has transacted business in this State;

c)    Defendant has committed a tortious act in whole or in part in this State;

d)    Defendant is causing or has caused tortious injury in this State by an act or omission;

e)    Defendant has an interest in, is using, or possessing real property in this State; or

f)    Defendant entered into a contract to be performed in whole or in part by either party in this State.

## PARTIES

**A.    <u>The Plaintiff</u>**

8)    The Plaintiff is a South Carolina state agency created by statute, administered under the supervision and control of the South Carolina Board of Health and Environmental Control pursuant to S.C. Code Ann. § 44-1-20, and is authorized and empowered to implement CERCLA and to bring this action under the SCHWMA, § 44-56-200 and the PCA, § 48-1-50.  The Department also has the power and authority to make separate orders and rules to meet any

emergency not provided for by general rules and regulations to suppress nuisances dangerous to the public health. S.C. Code Ann. § 44-1-140.  The Department brings this action on behalf of the state of South Carolina, which is a "State" within the meaning of CERCLA § 101(27) and § 107(a)(4)(A).

**B.**  **The Defendants**

9)  Each Defendant, or its predecessor or one or more of its current or former affiliates, related parties, divisions or subsidiaries, arranged for disposal or treatment, or arranged for transportation for disposal or treatment, of CERCLA hazardous substances, pollutants, and contaminants or petroleum compounds and/or petroleum by-products to the Facility Property. For convenience, all Defendants other than the United States of America may be referred to herein as the "Non-Federal Defendants."

## GENERAL ALLEGATIONS

**A.**  **The Property**

10)  The Facility Property is located at 2324 Vernsdale Road, approximately 4.5 miles southwest of the City of Rock Hill, South Carolina.  Robertson Road borders the Facility Property to the northeast and the Norfolk Southern Railroad forms the northwestern boundary. Fishing Creek borders the Facility Property to the southeast. Wildcat Creek flows through the Facility Property and flows into Fishing Creek in the southern portion of the Facility Property. The Facility Property consists of approximately 44.5 acres of industrial property on the west side of Wildcat Creek. The Facility Property is surrounded by undeveloped land and commercial/industrial properties.

**COMPLAINT**
*SC DHEC v. United States of America et al.*

11)     Several buildings are located on the Facility Property, including a former office on the northern portion of the Facility Property close to Robertson Road, a large warehouse building along the northwest portion of the Facility Property bordered by a railroad line, a wastewater treatment building located in the southwest portion of the industrial portion of the Facility Property, and several other small buildings across the industrial portion of the Facility Property.

**B.     <u>Historic Operations</u>**

12)     <u>Facility History</u>.   The Facility is a former Resource Conservation Recovery Act ("RCRA") hazardous waste treatment, storage, and disposal facility. Beginning in 1966, Quality Drum Company and, later, Industrial Chemical Company conducted operations consisting of waste storage, treatment, and recycling. The Facility received spent solvents from offsite facilities, stored the solvents at the Facility Property in drums and tanks, and recovered these solvents through distillation. Until 1981, wastes from the distillation process (e.g., still bottoms) were sent to a local landfill. In 1981, a hazardous waste incinerator was installed on the Facility Property for treatment of still bottoms and the operators of the Facility began to process a broader variety of waste streams. Quality Drum Company and Industrial Chemical Company merged in December 1982.

13)     In May 1983, Stablex South Carolina, Inc. acquired the Facility and the Facility Property. At that time, approximately 26,000 drums and 200,000 gallons of bulk liquid waste stored in tanks were present on the Facility Property. In 1986, NuKEM acquired the stock of Stablex Corporation, which upon information and belief then held the stock of Stablex South Carolina, Inc.  Stablex South Carolina, Inc. continued to own and operate the Facility and changed its name to ThermalKEM, Inc. ("ThermalKEM"), in January 1987. ThermalKEM operated the Facility Property as a hazardous waste incinerator and storage facility under RCRA interim status. Philip

Services Corporation ("PSC") acquired ThermalKEM through a subsidiary, Petro-Chem, and took over operation and management of the Facility Property in November 1995. PSC ceased operation of the incinerator one month later and submitted an incinerator closure plan to the Department in 1996, which plan they subsequently revised in 1997 and 1998. PSC continued to operate the Facility Property as a fuel blending, storage, and transfer facility until at least 1999. PSC, along with its subsidiaries, including ThermalKEM, filed for bankruptcy protection in June 2003.

14) During the years of operation, the Facility Property sustained two large structural fires. The Facility Property also experienced a subsurface diesel fuel release, with the quantity of fuel spilled estimated to be greater than 200,000 gallons, as well as various releases of hazardous substances, pollutants, and/or contaminants into the environment.

## C.   Contamination at the Site

15) During operation of the Facility, the RCRA Part B Permit Corrective Action process identified four solid waste management units ("SWMUs") and seven areas of concern ("AOCs"). The SWMUs and AOCs, and a brief description of the wastes managed/disposed in each area, are presented below.[1]

a)   Incinerator Building Sump (SWMU 8). This area contained ash and water from the incinerator water seals. The incinerator was operated from approximately 1981 to 1995.

---

[1] The SWMU's listed herein are numbered 8, 11. 19 and 41. Other SWMU's were previously addressed.

**COMPLAINT**
*SC DHEC v. United States of America et al.*

b)    <u>Container Storage Area (SWMU 11)</u>.  This area was used for the storage of a large number of drums of spent halogenated and non-halogenated solvents on the surface of the ground. This location was used for container storage from before 1983 until 1995.

c)    <u>Truck Washing Station and Sump (SWMU 19)</u>.  Wastes managed included wash water, residue, and soil from trucks carrying spent halogenated and non-halogenated solvents. The truck washing station and sump were operated from 1981 until 1995.

d)    <u>Burn Pits (SWMU 41)</u>.  This area was used for the disposal of solvent distillation still bottoms by open pit burning. The burn pits were operated approximately between 1966 and the early 1970s.  Impacted soil, drums, and waste material were excavated in this area to a depth of eight feet in 1985 under supervision of the Department.

e)    <u>Solvent Ditch (AOC)</u>.  Spillage and leakage from tank trucks and the tank farm migrated to this area via storm water runoff. This ditch existed from the 1960s until 1983. Soil excavation was performed to remove visibly impacted material in 1983.

f)    <u>Fuel Oil (AOC)</u>.  This was an area of concern due to the suspected diesel fuel leaks from tanks and underground piping associated with three underground storage tank systems used to deliver diesel fuel to the incinerator.

g)    <u>Drum Repacking Area/Fire (AOC)</u>.  A building in this area housed spent halogenated and non-halogenated solvents in lab pack form and drums of solids and sludges from spent solvents. The building was destroyed by fire in 1995 and rebuilt the same year.

h)    <u>Blend Tank Overflow (AOC)</u>.  This area included a tank farm where liquids containing spent halogenated and non-halogenated solvents were blended for incineration prior to 1995.

**COMPLAINT**
*SC DHEC v. United States of America et al.*

i)    Scrubber Containment Overflow (AOC).    Wastes managed at this location included caustic solutions of scrubber water with particulate matter from incineration.

j)    Boiler Explosion (AOC). The boiler was used as a backup steam supply for the scrubber and was replaced after it exploded in March 1991. No wastes were managed here but approximately fifty gallons of diesel fuel were released with the boiler explosion.

k)    Stormwater Outflows (AOCs).    These areas of concern include the collection and outflow areas for stormwater runoff from the industrial portion of the Facility Property and treatment, storage, and disposal areas.

**D.    The Department's Response to Contamination**

16)    In or around November 2004, the Department provided notice of potential liability to certain potentially responsible parties ("PRPs") and hosted a meeting with a group of PRPs (the "PRP Group") in December 2004.  This group of PRPs later formed the Philip Services Site PRP Group (the "PRP Group"). The Department provided an opportunity to negotiate settlement of the PRP Group's joint and several liability at the Site.  The Department provided notice to additional PRPs in May 2005.  The Department extended the moratorium in order to provide sufficient time for negotiation. In 2005, the PRP Group submitted to the Department a good faith offer to perform the Remedial Investigation ("RI") and Feasibility Study ("FS") (the RI and FS, collectively, "RI/FS").  Thereafter, the Department evaluated the good faith offer and determined the good faith offer was insufficient and, therefore, decided to perform the RI/FS itself and began that process.  The Department provided additional notices of potential liability to PRPs in 2006, 2014, and 2017.

17) <u>The Department's RI/FS</u>. The Department initiated the RI in December 2005 and completed it in September 2008. RI activities included sampling soil, groundwater, sediment, and surface water to determine the nature and extent of contamination. The sampling results for these media are summarized below. The FS, which evaluated remedial alternatives for the Site, was completed on July 22, 2011.

18) <u>Contaminants of Concern ("COCs")</u>. Three classes of volatile organic compounds ("VOCs") and their typical degradation products were identified as having the highest concentrations in both soil and groundwater sitewide. Inorganics (i.e., metals) were also identified as COCs in soils. Although other compounds were detected onsite, they were generally coupled with higher concentrations of compounds from one of the three identified classes shown below.

   a)   Chlorinated ethenes and ethanes ("CEE"). Chloroethane; 1,1-dichloroethane; 1,2-dichloroethane; 1,1-dichloroethene; cis-1,2-dichloroethene; 1,1,2,2-tetrachloroethane; tetrachloroethene; 1,1,1-trichloroethane; trichloroethene; 1,1,2-trichloroethane; and vinyl chloride.

   b)   Chlorinated benzenes ("CB"). Chlorobenzene; 1,2-dichlorobenzene; 1,3-dichlorobenzene; 1,4-dichlorobenzene; 1,2,3-trichlorobenzene; and 1,2,4-trichlorobenzene.

   c)   Benzene, toluene, ethylbenzene, and xylene ("BTEX").

19) <u>Soil Areas of Concern</u>. Soil samples analytical data were compared with EPA Region 9 Preliminary Remediation Goals ("PRGs") for industrial soil and/or EPA Region 9 Soil Screening Levels ("SSLs") with a dilution-attenuation factor ("DAF") of 20 in the RI report (October 2004 version of the PRGs and SSLs). Surface soil sampling results revealed concentrations that exceeded the EPA Region 9 PRGs for industrial soil and/or EPA Region 9

**COMPLAINT**
*SC DHEC v. United States of America et al.*

SSLs for the VOCs. The highest concentrations of inorganics were scattered across various portions of the industrial portion of the Facility Property. The highest concentrations of VOCs were primarily confined to four areas of the Site: North Drum Storage Area, Solvent Ditch Area, Incinerator/Drum Repackaging Area, and South Drum Storage Area. The four areas shown on Figure 2-3 of the Feasibility Study Report (CDM 2011) were estimated based on the extent of SSL exceedances with a DAF of 20, and are summarized below:

a) <u>Warehouse (Drum Storage and Management) Area (Soil Area #1)</u>. This area is located on the northern end of the warehouse and includes the former East Drum Storage, Drum Receiving, and Drum Packaging areas. Only CEE compounds were detected above SSL/PRG screening criteria in this area.

b) <u>Incinerator/Drum Repackaging Area (Soil Area #2)</u>. This area includes both the southern end of the warehouse (Drum Repackaging and Fire Area) and the former incinerator area southeast of the warehouse. BTEX, CB, and CEE compounds were all detected above screening criteria in this area. Sitewide, the highest concentrations were detected in this area for all three VOC classes.

c) <u>Solvent Ditch Area (Soil Area #3)</u>. This area contains the former solvent ditch area. This area is also located southeast of the former Blend Tanks Overflow area. BTEX and CEE compounds were detected above screening criteria in this area.

d) <u>South Drum Storage Area (Soil Area #4)</u>. This area is the furthest southwest in the industrial portion of the Facility Property and, although this area does not include any previously identified SWMUs, it is adjacent to the former stormwater pond and a former drum storage area. BTEX and CEE compounds were detected above screening criteria in this area.

**COMPLAINT**
*SC DHEC v. United States of America et al.*

e)  Of these areas, the Incinerator Area had the highest concentrations of all three classes of compounds. The South Drum Storage Area had the lowest average concentrations in surface soil. Soil sampling results revealed that concentrations also exceeded industrial soil PRGs and/or SSLs in the subsurface of the four identified areas. The detected concentrations in subsurface soils were generally higher than surface soil in all four areas and, in some cases, exceeded surface soil detections by a factor of ten. Subsurface samples also contained detections of the three VOC classes below the water table in each area.

20)  <u>Groundwater Areas of Concern</u>.  Based on information derived from the hydrogeology and concentration contour maps prepared during the RI, four groundwater areas ("GW Areas") of concern were identified. These GW Areas are shown on Figure 2-4 of the Feasibility Study Report (CDM 2011) and include the following:

a)  <u>Incinerator/Drum Repackaging Area (GW Area #1)</u>. The Incinerator Area has the highest concentrations of CB in regolith (shallow) groundwater and soil. GW Area #1 contained concentrations of up to 13,000 µg/l of 1,2-dichloroethane (1,2 DCA), and 14,000 µg/l of trichloroethene (TCE) which are above their respective maximum contaminant levels (MCLs) of 5 µg/l.

b)  <u>Solvent Ditch Area (GW Area #2).</u> Groundwater in the Solvent Ditch Area contains the highest concentrations of chlorinated ethenes in regolith, and the highest concentrations of all three VOC classes were detected in bedrock. This area extends into the North Drum Storage location because detected compounds in groundwater are consistent with concentrations in the Solvent Ditch Area. GW Area #2 contained concentrations of 1,2 DCA of 52,000 µg/l, above the MCL of 5 µg/l.

**COMMPLAINT**
*SC DHEC v. United States of America et al.*

c)    Burn Pits (GW Area #3). Although a removal action occurred in this area in 1983, groundwater concentrations do not suggest that VOCs are a result of migration from other areas. GW Area #3 contained concentrations of 1,2 DCA of 4,100 µg/l, which is above the MCL of 5 µg/l.

d)    Fuel Oil Area (GW Area #4). The Fuel Oil Area is a GW Area because free product is still present in this location.

e)    Groundwater sampling results were consistent with the observed soil sampling results in most GW Areas. In the areas with the highest concentrations of VOCs in soil, groundwater concentrations were comparably high. Soil concentrations in the Burn Pits and Fuel Oil Area may not be as high in these areas because soil excavation was previously performed in the Burn Pits and the fuel oil free product in the Fuel Oil Area is in the subsurface. The fuel oil free product is associated with a former underground release meaning that the oil did not have to migrate through a large depth of soil to reach the groundwater.

f)    Groundwater contamination is likely to be from the four Soil Areas. RI data indicates there are plumes originating from the Solvent Ditch Area, Drum Management Area, Incinerator Area, North Drum Storage Area (although co-mingled with the Solvent Ditch Area), Burn Pits, and Fuel Oil Area. The only Soil Area that does not correspond to higher concentrations in groundwater is the South Drum Storage Area (Soil Area #4).

21)    Sediment. Sediment samples were collected from Wildcat and Fishing Creeks. Some compounds were detected in the sediment samples from Wildcat Creek that were above laboratory quantitation limits, however all of the compounds were either below PRGs or were consistent with the concentrations detected in the background samples.

**COMPLAINT**
*SC DHEC v. United States of America et al.*

22)    <u>Surface Water</u>.  An extensive surface water investigation was completed in 2004 and revealed minimal surface water impacts. The investigation included installing vapor diffusion modules in Fishing and Wildcat Creeks and performing onsite screening using a gas chromatograph. The investigation also included collection of surface water samples for laboratory analysis. Limited impacts were observed in the onsite screening and no VOCs were detected in the laboratory surface water samples.

23)    Several soil and groundwater investigations were conducted during the operation of the Facility. Based on these investigations, the Department installed a groundwater extraction and treatment system in 1988 to address petroleum contamination. Additional extraction components (groundwater extraction wells EW-2 and EW-3 and a fuel oil free product interceptor trench) were installed in the mid-1990s. The Department completed upgrades to the groundwater treatment system in 2005.

24)    The incinerator was shut down and dismantled in the late 1990s, and soil was excavated beneath the incinerator leaving an open pit. In 2004, the Department backfilled the open pit and demolished the incinerator building The Department also completed upgrades to the groundwater treatment system in 2005.

25)    The Department completed its Feasibility Study in 2011, and in August 2014, issued its Proposed Plan for Remediation of the Site and the Department hosted a public meeting to summarize the remedy alternatives considered by the Department and to gain public input and comments.  The Department provided a thirty-day comment period to the public in which to provide written comments to the Proposed Plan from August 26, 2014, until September 26, 2014.  At the request of the public at the public meeting, the Department provided an extension of the comment period until November 26, 2014.  At the request of the public, the Department also resampled nearby

residential private wells. The Department did not detect any contamination in the private wells as a result of this additional sampling.

26)   After consideration of the comments made during the public meeting and after not receiving any written comments during the extended comment period, on June 22, 2016, the Department issued its remedy decision document, the Record of Decision ("ROD") (Appendix 4 to the attached Proposed Consent Decree, which Proposed Consent Decree is attached hereto as Exhibit 1). The Department identified Combined Alternative 3 – Hydraulic Containment, Soil Vapor Extraction ("SVE"), Thermal Enhanced Multi-Phase Extraction ("MPE"), and In Situ Thermal Treatments – as the selected Remedy for the Site.

27)   The response action selected by the Department is necessary to protect the public health and welfare or the environment from actual or threatened release of hazardous substances, pollutants, and contaminants into the environment.

28)   The Department developed a Statement of Work ("SOW") (Appendix 6 to the attached Proposed Consent Decree, which Proposed Consent Decree is attached hereto as Exhibit 1) to address the design of the Remedy selected in the ROD, work phases of remedial action, and achievement timetables for various phases of the remedial action, including the operation and maintenance activities.

**E.   The Department's Response Costs**

29)   The Department incurred and continues to incur response costs at the Site through investigating, monitoring, surveying, testing, and gathering information to identify the existence and extent of the release or threatened release of hazardous substances, the source and nature of the hazardous substances involved, and the extent of any danger to the public health, welfare, or the

**COMPLAINT**
*SC DHEC v. United States of America et al.*

environment.   Further, the Department evaluated cleanup alternatives and selected the Remedy for cleanup.   In addition, the Department has expended funds and extensive time for planning, legal services, and other activities necessary and appropriate to direct response actions, for enforcement purposes, and in negotiations with the Defendants and others in reaching settlement outlined in the attached and proposed Consent Decree.

30)    Through November 30, 2021, the Department estimates its response costs at the Site to be at least Eight Million, Six Hundred Sixty-five Thousand, Nine Hundred Sixty-one Dollars and Eighty-seven Cents ($8,665,961.87) with approximately Five Million, Five Hundred Sixteen Thousand, Three Hundred Forty-one Dollars and Ninety Cents ($5,516,341.9) in unrecovered costs.   The Department has incurred, and will continue to incur, response costs in the form of overseeing the design of the Remedy, the implementation and performance of the actual Remedy, any future remedial investigation, remediation costs, other response costs, and the costs of this action.

### I. COUNT ONE
### (Plaintiff's Cost Recovery Claim under CERCLA Section 107)

31)    Plaintiff incorporates all preceding allegations as if fully restated herein.

32)    Pursuant to S.C. Code Ann. § 44-56-200(A), the Department is empowered to implement and enforce CERCLA.

33)    The Site is a "facility" within the meaning of Section 101(9) of CERCLA, 42 U.S.C. § 9601(9).

34)    Defendants are persons, within the meaning of Section 107(a)(3) of CERCLA, 42 U.S.C. § 9607(a)(3), that by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances

**COMPLAINT**
*SC DHEC v. United States of America et al.*

owned or possessed by such person, by any other party or entity, at the Site. Under Section 107(a) of CERCLA, 42 U.S.C. § 9607(a), each of the Defendants is jointly and severally liable to the Plaintiff for all costs incurred, or to be incurred, by the Plaintiff at the Site, including interest and attorney's fees.

35) The above-described conditions at the Site constitute a release or threatened release of hazardous substances, as defined and used in Sections 101(14), 101(22), and 107(a) of CERCLA, 42 U.S.C. §§ 9601(14), 9601(22), and 9607(a). The conditions at the Site continue to constitute a release and threatened release.

36) The release or threatened release of hazardous substances from the Site has caused and will continue to cause the Department to incur direct and indirect costs of response as defined in CERCLA §§ 101(23), (24), and (25) and the regulations promulgated thereunder.

37) Each Defendant is strictly, jointly, and severally liable for all direct and indirect response costs incurred, and to be incurred, by the Department at the Site.


## II. COUNT TWO
### (Plaintiff's Declaratory Judgment Claim)

38) Plaintiff incorporates all preceding allegations as if fully restated herein.

39) The Department seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201, 2202, CERCLA § 113(g)(2), and S.C. Code Ann. § 15-53-20 in order to adjudicate a question of actual controversy between the Department and Defendants, as set forth above.

40) The Defendants are each strictly, jointly, and severally liable for all response costs incurred, and all future response costs to be incurred, by the Department at the Site. Under 28 U.S.C. 2201(a) and Section 113(g)(2) of CERCLA, 42 U.S.C. § 9613(g)(2), and S.C. Code § 44-56-200, Plaintiff

is entitled to an order declaring that each and every one of the Defendants is jointly and severally liable for, or in the alternative, is liable to contribute its equitable share of, all response costs or damages to be incurred in the future by the Department with respect to the Site.

### III.  COUNT THREE
### (Plaintiff's Cost Recovery Claim under SCHWMA)

41)  The Department incorporates all preceding allegations as if fully restated herein.

42)  S.C. Code Ann. § 44-56-200(C)(1) of SCHWMA, incorporates and adopts CERCLA § 107, as amended, as the law of South Carolina.  S.C. Code Ann. § 44-56-200(C)(1) grants the Department the authority "to recover on behalf of the State all response costs expended from the Hazardous Waste Contingency Fund or from other sources, including specifically punitive damages in an amount at least equal to and not more than three times the amount of costs incurred by the State."

43)  Plaintiff seeks recovery of response costs incurred at the Site as authorized by S.C. Code Ann. § 44-56-200.

44)  Each Non-Federal Defendant is strictly, jointly, and severally liable for all direct and indirect response costs incurred, and to be incurred, by Plaintiff at the Site under S.C. Code Ann. § 44-56-200.

45)  The response costs incurred, and to be incurred, by Department have been expended from the Hazardous Waste Contingency Fund and from other funding sources.  Therefore, the Department seeks from the Non-Federal Defendants all of its past and response costs and certain of its future response costs in addressing the release and threatened release of hazardous substances at the Site as set forth above.

## IV. COUNT FOUR
### (Plaintiff's Claim Under the PCA)

46)    Plaintiff incorporates all preceding allegations as if fully restated herein.

47)    The purpose of the PCA is to maintain standards of purity of the State's air and water and to protect human health and the environment through the safe disposal of hazardous substances, pollutants, or contaminants.  S.C. Code Ann. § 48-1-20.

48)    Under the PCA, it is "unlawful for any person, directly or indirectly, to throw, drain, run, allow to seep or otherwise discharge into the environment of the State organic or inorganic matter, including sewage, industrial wastes and other wastes, except as in compliance with a permit issued by [the Department]."  S.C. Code Ann. § 48-1-90.

49)    The Non-Federal Defendants did not have a permit for the release or disposal of hazardous substances, pollutants, or contaminants.

50)    By releasing, disposing of, or failing to prevent the disposal of, hazardous substances, pollutants, or contaminants at the Site, the Non-Federal Defendants violated the PCA.

51)    By arranging for the treatment, storage, and disposal of hazardous substances, pollutants, or contaminants, and/or petroleum products, and/or petroleum compounds at the Site, the Non-Federal Defendants violated the PCA.

52)    By transporting hazardous substances, pollutants, or contaminants, and/or petroleum products, and/or petroleum compounds to the Site for the treatment, storage, and disposal of which waste was treated, stored, and disposed at the Site, which came to be located at the Site and released into the environment, the Non-Federal Defendants violated the PCA.

**COMMPLAINT**
*SC DHEC v. United States of America et al.*

# I.    PRAYER FOR RELIEF

**WHEREFORE**, the Plaintiff requests the following relief be granted by the Court:

1)    For judgment in favor of the Department declaring that the Defendants are strictly, jointly, and severally liable for all future response costs incurred, and to be incurred, by the Department at the Site, including interest, costs, and attorneys' fees for this action, except as otherwise provided in the Consent Decree;

2)    For approval and entry by this Honorable Court of the proposed Consent Decree, attached as Exhibit 1 to this Complaint and agreed to by the parties, as this Court's judgment; and

3)    For such other and further relief as this Court deems just and proper.

Respectfully submitted,

_/s/_____
KELLY D. H. LOWRY, ESQ.
Law Firm of Lowry and Associates, LLC
753 E. Main St., Ste. 7
Spartanburg, SC  29302
Federal Bar #7078


KAREN C. RATIGAN, ESQ.
S.C. Department of Health & Environmental Control
Office of General Counsel
2600 Bull St.
Columbia, SC  29201
Federal Bar #12535

**_Attorneys for the Plaintiff, South Carolina Department of Health and Environmental Control_**

October 4, 2022